IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 12-CR-00158-REB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

WALDEN ALLEN SCHMIDT,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
(Motion Hearing)

_____

      Proceedings before the HONORABLE ROBERT E. BLACKBURN, Judge, United States District Court for the District of Colorado, commencing at 2:11 p.m., on the 30th day of January, 2019, in Courtroom A1002, United States Courthouse, Denver, Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Tracy Weir, 901 19th Street, Room A258, Denver, Colorado 80294, (303) 298-1207

1          **APPEARANCES**

2          ALECIA RIEWERTS, Assistant U.S. Attorney, 1801

3    California Street, Suite 1600, Denver, Colorado 80202,

4    appearing for the plaintiff.

5          The defendant appeared pro se.

6                    *   *   *   *   *

7                      **PROCEEDINGS**

8          (In open court at 2:11 p.m.)

9          *THE COURT:*  Good afternoon, and thank you.  Please be

10   seated.

11         We again open the record in 12-cr-00158, identified as

12   United States of America versus Walden Allen Schmidt,

13   defendant.

14         The matter comes before the Court once again for

15   hearing and consideration of Mr. Schmidt's pro se motion to

16   amend conditions of release, document 70, filed October 4,

17   2018.

18         At this hearing, the Government again appears by

19   assistant United States attorney, Alecia Riewerts.  Good

20   afternoon.

21         *MS. RIEWERTS:*  Good afternoon, Your Honor.

22         *THE COURT:*  The defendant, Walden Allen Schmidt, is

23   present in person pro se.  Good afternoon.

24         *THE DEFENDANT:*  Good afternoon, Your Honor.

25         *THE COURT:*  The supervising probation officer, Gary

 1    Kruck, is also present.  Good afternoon.

 2             *MR. KRUCK:*  Good afternoon, Your Honor.

 3             *THE COURT:*  I assume we are prepared to proceed to

 4    hearing, but I inquire to confirm.  Mr. Schmidt, are you now

 5    prepared to proceed?

 6             *THE DEFENDANT:*  Yes, Your Honor.  Thank you for the

 7    additional time.

 8             *THE COURT:*  You're welcome.

 9             Ms. Riewerts, is the Government prepared to proceed?

10             *MS. RIEWERTS:*  Yes.  The Government is prepared to

11    proceed.  Thank you, Your Honor.

12             *THE COURT:*  Mr. Schmidt is requesting a modification

13    of existing conditions of supervision; thus, it becomes his

14    burden of both production and persuasion.

15             I exercise my discretion under Federal Rules of

16    Evidence 611(a)(1) to dispense with an opening statement.

17    We'll proceed to the respective presentations, hearing first

18    from the defendant whose burden it is.

19             Mr. Schmidt, you may proceed by evidence, affidavit,

20    declaration, or any reasonable combination thereof.

21             *THE DEFENDANT:*  Thank you, Your Honor.

22             *THE COURT:*  You're welcome.  It seems that you have

23    organized your materials at the table.  I'm going to allow you

24    to be heard at your table as opposed to the lecturn.

25             *THE DEFENDANT:*  Okay.

1          *THE COURT:*  So long as you speak loudly and clearly so

2     that you are report -- our reporter can report that which you

3     say and offer.

4          *THE DEFENDANT:*  Okay.  Thank you, Your Honor.

5          *THE COURT:*  You're welcome.

6          *THE DEFENDANT:*  I'd like to start off by saying that I

7     am fully responsible for all of my actions.  I do not for a

8     minute think any force or other person or entity caused my

9     actions other than myself.  And I take full responsibility.

10          In no way do I project myself as any sort of victim

11     for I am not.

12          At the time that I committed the offense, I had

13     foolishly convinced myself that I was not harming anybody by my

14     actions.  I was wrong.  I did harm innocent victims.  I added

15     to their pain.  For that, I have great remorse and regret for

16     my actions.

17          I'd like to talk a little bit about the background

18     which led to my decision before I get into my evidence.  Is

19     that okay?

20          *THE COURT:*  That's fine.  But it strikes me that your

21     presentation is quintessentially in the nature of testimony.

22          *THE DEFENDANT:*  Correct.

23          *THE COURT:*  If it is, I'm only going to consider the

24     evidence that is presented.  Let me administer the oath

25     required under Rule 603.

1    *THE DEFENDANT:*  Absolutely.

2    *THE COURT:*  We'll consider that which you're

3    presenting even though it's at your table, not the witness

4    stand, as sworn testimony and evidence.

5    *THE DEFENDANT:*  Okay.  Absolutely.

6    *THE COURT:*  Please raise your right hand to be sworn.

7    (**WALDEN ALLEN SCHMIDT** was sworn.)

8    *THE DEFENDANT:*  Yes, Your Honor, I do.

9    *THE COURT:*  Very well.  Under oath, what is it you

10   would tell the Court?

11   *THE DEFENDANT:*  Several years before I committed this

12   act, my son passed away.  I attended a SIDS meeting with his

13   mother, and the thing I took out of that was that no two people

14   handle the death of a child in the same way.  That was the

15   significant thing.

16   His mother, shortly thereafter, tried multiple times

17   to commit suicide.  Fortunately, she was not successful.  I

18   focused on helping her work through her problems.  I tried to

19   be strong and I tried to -- in result, I suppressed my own pain

20   for a long time.

21   As she healed, I started to sink in my own world.  I

22   turned to cocaine as a means of knowing my own grief.  I didn't

23   properly facilitate my grief.

24   During this time, I used peer-to-peer file sharing

25   networks to download music for my job.  I was doing it since

1    the '90s starting with Napster and moving on to other

2    file-sharing programs.  I don't know much about the programs I

3    used.  I knew they were file sharing.  I was aware people could

4    upload music and files from my computer.  I have no denial

5    about that aspect of the file-sharing program.  I didn't know

6    all the details about it.

7            One day in the midst of downloading music, I

8    discovered that you could click on a person's -- their name,

9    and you could look at all the files on their computer rather

10   than just typing in code names.  It was then that I discovered

11   child pornography.

12           As a result, my curiosity piqued, and I explored it,

13   which was wrong.  I didn't realize the ramifications of it, but

14   my reaction to it was not sexual in nature.  It was -- I felt

15   feelings of anger, sadness, pain, yet also relief because it

16   relieved my own pain from the death of my child and transferred

17   it onto somebody else's pain.

18           But I continued to explore it.  I have a lot of

19   history of wanting to help others.  Through my job I was able

20   to earn a bachelor's degree in social work.  A person doesn't

21   go into social work to become wealthy.  They go into social

22   work because they genuinely care about helping and healing.

23           While in my social work program, I took a research

24   class.  For my research project in that class, I was working in

25   the adult entertainment industry, and my research project was

1    to determine the correlation between child abuse and neglect
2    and that industry and the women that danced in that industry.
3    I was very serious about what motivated them to get into that
4    industry.

5            I did a research paper on it.  I got an A plus, and
6    the professor liked it so well that he later used it as the
7    reference for other classes that he taught.  I was very proud
8    of that work that I did on that.

9            That's my character.  After my son died, a switch went
10   off inside me.  It's like I went into empathy overload.  Still
11   to this day I cannot watch movies, television, commercials
12   without becoming emotional, especially when there's very happy
13   endings or very sad endings.  It affects me greatly.  I cry
14   openly.

15           It was a terrible experience while in prison because
16   you're surrounded by other inmates, and the last thing you want
17   to do is look weak.  I maintained and managed.  I found ways.
18   Even reading books will trigger those emotions sometimes.

19           Okay.  So that's my testimony part.  That's my sworn
20   testimony.

21           Now, I would like to refer to several pieces.  One
22   comes from -- I don't know what exhibit number the State has on
23   this.  It comes from the United States Sentencing Commission.
24   The Sentencing Commission has gone on to say --

25           *THE COURT:*  Well, just a moment.  So that the record

1    is clear, we need to mark these exhibits that you intend to

2    present.

3              *THE DEFENDANT:*  I believe it is marked.  Your exhibit

4    for the U.S. Sentencing Commission.

5              *MS. RIEWERTS:*  Your Honor, I would just note for

6    clarity of the record that the Government, because it thought

7    it would be referring to portions of a 2012 Sentencing

8    Commission report, on December 31 it was received by

9    Mr. Schmidt's -- by Mr. Schmidt at his residence.

10             *THE DEFENDANT:*  Yes.

11             *MS. RIEWERTS:*  So we sent the entire report, which is

12   300-plus pages, and then there were several appendices attached

13   to it.  The Government only intends to put in evidence two

14   excerpts from that document.  I do have a complete copy of the

15   document with me so I would be able to reference page number.

16             Obviously, for purposes of the record, if that doesn't

17   overlap with the exhibits I have, it may be best to mark them

18   and put them in evidence.

19             *THE COURT:*  What I'm going to direct Mr. Schmidt to do

20   is with respect to any documentary exhibit on which he intends

21   to rely or offer to the Court, it needs to be marked as a

22   defendant's exhibit, and we'll start numerically, 1, 2, 3, 4.

23             *THE DEFENDANT:*  I think I got letters.

24             *THE COURT:*  Then we'll do alphabetically.

25             *THE DEFENDANT:*  Sorry for this, Your Honor.

1          THE COURT:  That's fine.  Take the time now.  Let's

2     mark the exhibit to which you are now referring.

3          THE DEFENDANT:  Do I read it now?

4          THE COURT:  What are you holding?

5          THE DEFENDANT:  Defendant D.

6          THE COURT:  Defendant's Exhibit?

7          THE DEFENDANT:  D, as in David.

8          THE COURT:  For identification, what is it?

9          THE DEFENDANT:  Page 78 from the United States

10    Sentencing Commission.

11         THE COURT:  All right.  Are you offering it in

12    evidence for the limited purpose of this hearing?

13         THE DEFENDANT:  Just one line from it, sir.

14         THE COURT:  Any objection to the defendant reading

15    into the record that one line?  That needs to be preceded by

16    any objection to admission of defendant's Exhibit D for

17    identification.

18         MS. RIEWERTS:  The Government is familiar with this

19    report in terms of its foundation and authenticity.

20         With regard to the report, for the purposes of the

21    record, I would just make the record --

22         THE COURT:  Well, any objection?

23         MS. RIEWERTS:  The Government has no objection to

24    page 78 of the United States Sentencing Commission 2012 Report

25    to the Congress: Federal Child Pornography Offenses being

10

1    entered into evidence.

2         THE COURT:  Well, Exhibit D for identification is

3    admitted in evidence.  I'm going to allow you the unusual

4    opportunity to read the one line into the record.

5         THE DEFENDANT:  Okay.  It says, "nonsexual motivations

6    for viewing child pornography include curiosity, compulsive

7    collecting behaviors, avoidance of stress or dissatisfaction

8    with life."

9         The reason I read that line is to show that even the

10   Sentencing Commission has recognized that there are reasons

11   beyond sexual interest for doing this, and it has been

12   recognized by the Commission, yet they don't anywhere in their

13   report go on to say how to treat that.  I wanted to put that in

14   there.

15        THE COURT:  Most importantly, they don't go on to say

16   that is the condition from which you were suffering at the

17   relevant time either.

18        THE DEFENDANT:  No.  You're right.  You're right, sir.

19   I'm pointing out they do recognize the fact it is possible.

20        THE COURT:  Eventually, you're going to have to link

21   all of this up to your specific concerns, polygraph,

22   plethysmograph, and no contact with minor children.

23        THE DEFENDANT:  Okay.  In terms of the no contact with

24   minors, as I stated in my initial motion, there's no relevant

25   conduct that suggests I have put any minor -- that I've been in

1    physical contact with and actual danger.  In the case of

2    *Burns v. United States*, the Court ruled that -- do I need to do

3    another exhibit here?

4              *THE COURT:*  What is it?

5              *THE DEFENDANT:*  It's the appendix from the SOMB

6    position regarding sex offender contact with his or her own

7    child, page 220.

8              *THE COURT:*  Mark it as a defense exhibit, please,

9    alphabetically.

10             *THE DEFENDANT:*  Okay.  Exhibit E, please.

11             *MS. RIEWERTS:*  Was that from the original of the

12   exhibit when we were in court last time?

13             *THE DEFENDANT:*  Yes.

14             *THE COURT:*  Are you offering Exhibit E?

15             *THE DEFENDANT:*  Yes.

16             *THE COURT:*  Any objection by the Government?

17             *MS. RIEWERTS:*  Your Honor, I'm sorry.  I missed the

18   page number.

19             *THE DEFENDANT:*  220.

20             *MS. RIEWERTS:*  There is no objection as the Government

21   is going to move the entire document into evidence.

22             *THE COURT:*  Defendant's Exhibit E for identification

23   admitted in evidence.

24             *THE DEFENDANT:*  It says here in *Burns* the Court ruled

25   that a parent has a constitutional right to familial

1   association.  *Burns* at 1223 citing *United States v. Edgin*.  The

2   Court continues saying, "When a Court imposes" --

3           THE COURT:  Slow down, Mr. Schmidt.  The court

4   reporter can't keep up with you.

5           THE DEFENDANT:  Okay.  I'll slow down.  I'm sorry.

6   Where do you need me to start from?

7           THE REPORTER:  If you would please start over.

8           THE DEFENDANT:  In *Burns* the Court rules that a parent

9   has a right to familial association.  *Burns* at 1223 citing

10  *United States v. Edgin*, 92 F.3d 1044, 1049 Tenth Circuit 1996.

11          The Court continued stating that, quote, "When a Court

12  imposes special condition that limits a fundamental right where

13  liberty interest, the Court must justify the condition with

14  compelling circumstances.  A conviction alone may not meet the

15  criteria for compelling evidence for restraining a parent's

16  constitutional right to parental association."

17          THE COURT:  All right.  Do you have any minor

18  children?

19          THE DEFENDANT:  I do, sir.  I have two minor children.

20  I'm engaged to a woman who has three minor children that are

21  not my biological children.  They would be my stepchildren.  I

22  also have two grandchildren that could potentially be affected

23  by this position, which I'm very concerned about.

24          They live in another state so I won't have regular

25  contact with them, but my daughter, who signed an affidavit

1    that was submitted with my motion, has stated that she has no

2    concerns regarding my interaction with them.

3         I feel that it's important for my children and

4    grandchildren to have normal bonds with me in the process of

5    their growing such as fishing trips or going to a ballgame or

6    things like that that having to go through supervised contact

7    could end up ultimately having a psychological negative impact

8    on them.  I'm very concerned about that.  I very much want them

9    to have the best possible childhood that they can.  That's very

10   important to me.

11        Let's see.

12        THE COURT:  For the record, your grandchildren are

13   also minor children; is that correct?

14        THE DEFENDANT:  Yes, that's correct, sir.  When I

15   first came to court, I only had minor children of my own.  I

16   did not have stepchildren to be or the grandchildren.  That's

17   why I'm addressing this now in this regard.

18        THE COURT:  You think **Burns** reaches as far as

19   stepchildren and grandchildren?

20        THE DEFENDANT:  I think that's up to you, sir.

21        THE COURT:  Fair enough.

22        THE DEFENDANT:  I -- you know, I'm kind of new at

23   this.  I'm trying my best to do this in a good way.  Let's see.

24        I think that's all I have as far as with my children

25   goes.  I feel like there's no other pattern of behavior that

1    I've displayed that would create a realistic concern for me

2    being around my children.  I guess that's all I want to say on

3    that particular judgment.

4         The other one as far as the treatment program goes,

5    again, the treatment program as I read through this Colorado

6    Sex Offender Management Board is designed to treat for sexual

7    deviancy.  I understand it is often assumed a person's

8    motivation for downloading child pornography is for sexual

9    purposes.  Probably 90 to 95% of the cases that's true, and I

10   have no doubt that this treatment program can be very

11   beneficial to many people that take the program.

12        However, when that isn't a person's motivation, it can

13   be counterproductive in that the safety that the program seeks

14   out can be equally achieved through monitoring a computer and

15   through grief therapy, which is really the treatment that I

16   seek and need.

17        I have a wonderful therapist I worked with prior to

18   going to prison who I fully intend to continue working with

19   regardless of the ruling of this Court.

20        *THE COURT:*  If I understand it, with respect to grief

21   therapy, you're not seeking to modify your conditions of

22   supervision to require your participation at the expense of the

23   probation office in grief therapy; am I correct?

24        *THE DEFENDANT:*  No.  I'll take care of the costs of

25   it.  That's fine.  That's my burden.

1          As far as the treatment program itself, there's

2    several beyond the fact I don't believe it's appropriate for me

3    in this particular circumstance.  There's also some additional

4    issues with the program itself.  I'm going to need to more some

5    more exhibits.  Let me see if I can find them here real quick.

6          One of the areas is the area of denial.  This isn't --

7    this is something I've learned since this Colorado Sex Offender

8    Management Board paper was released.  In talking to a woman

9    from the Colorado Sex Offender Reform Group has told me that

10   currently the newest edition of this, which I don't have a copy

11   of, now states that any patient who is in denial for three

12   months will immediately be terminated from the program if they

13   remain in denial.  That denial includes denial of intent.

14         That leaves me in a real quagmire because it leaves me

15   with a choice to not be honest or comply with the rules of

16   treatment.  I feel that this puts an unfair power on them to

17   restrain my liberties and ultimately send me back to prison as

18   a result of this aspect.

19         I would like to reference exhibit -- where is it?

20   Exhibit C.  This is an article from *The New Yorker* magazine

21   that was released in 2012.  It features a similar program that

22   was offered at Butner prison where it talks about -- let me see

23   if I can find it.  I had it marked before.  I don't have it

24   marked now.  Can I give you a basic summary, or do I need to

25   find the fact spots for a quote?

1          *THE COURT:*  Well, first, are you offering the exhibit

2     in evidence?

3          *THE DEFENDANT:*  Yes.  It's Exhibit C.

4          *THE COURT:*  Again, what is it?

5          *THE DEFENDANT:*  An article from *The New Yorker*

6     magazine from January 2012 reporting on the treatment program

7     at Butner prison in the east coast.

8          *THE COURT:*  How is that relevant to the treatment that

9     is required in the District of Colorado?

10         *THE DEFENDANT:*  Well, one of the ways that the

11    treatment offered relief to these inmates -- basically, if they

12    didn't admit to enough crimes or interaction with children,

13    they didn't progress in treatment.  They were withheld from

14    progressing in treatment.  This report, basically, started

15    making stuff up in order to advance in treatment.

16         *THE COURT:*  It's your position you will be exposed to

17    that in treatment in the state and District of Colorado?

18         *THE DEFENDANT:*  Through the statements of -- in this

19    Colorado Sex Offender Management Board and from what I've

20    learned, that if I don't admit to my intent as is alleged by

21    the treatment provider, then I can be kicked out of treatment

22    and, basically, violated and sent back to prison as a result.

23         *THE COURT:*  All right.  The exhibit again is

24    identified as Exhibit --

25         *THE DEFENDANT:*  C.

1          THE COURT:  Any objection by the Government?

2          MS. RIEWERTS:  Your Honor, with regard to the specific

3     circumstances of this hearing and the defendant proceeding pro

4     se, the Government can make argument that it's not relevant.

5     For purposes of this hearing, the Government doesn't have an

6     objection.

7          THE COURT:  Thank you.  Defendant's Exhibit C for

8     identification admitted in evidence.

9          THE COURT:  Now, please understand we're going to

10    harvest these exhibits from you at the conclusion of your

11    presentation because they become a part of the court record in

12    this hearing and case.

13         THE DEFENDANT:  Absolutely.

14         THE COURT:  So please segregate them.

15         THE DEFENDANT:  Okay.  I will.

16         THE COURT:  Tell me how that's relevant to your

17    concerns about the conditions that you have identified in your

18    motion to modify.

19         THE DEFENDANT:  Well, I believe it's relevant that if

20    I'm in a treatment program that is geared towards a subject

21    matter that isn't relevant to my circumstances, that I could

22    get caught in this trap.

23         THE COURT:  Well, you complain about special condition

24    No. 3.

25         THE DEFENDANT:  Correct.

1          THE COURT:  Polygraph, plethysmograph, and special

2    condition No. 6, the no contact with minors.  So I'm trying to

3    fit this argument in to those things about which you have

4    expressed concern in your motion.

5          The hearing is not an open invitation now to be heard

6    on any concern that you have, but it's an opportunity for you

7    to support your concerns about special condition No. 3 and

8    special condition No. 6.

9          THE DEFENDANT:  Wasn't condition 3 that I must

10   complete a specific sex offense evaluation treatment program?

11         THE COURT:  You tell me.

12         THE DEFENDANT:  I don't have the original.  Let me see

13   if I have the original.

14         THE COURT:  All right.  That's fine.  We can look it

15   up.

16         THE DEFENDANT:  I thought that's what I had.  I only

17   have the revised.  I think I have it here.

18         THE COURT:  As I read your motion concerning your

19   concern or objection to special condition No. 3, first it

20   involves the use of illegally invasive procedures such as a

21   plethysmograph.

22         THE DEFENDANT:  Right.

23         THE COURT:  Second, it involves the use of polygraphs.

24   Third, your intent is not a requirement for your conviction.  I

25   read a lot of words after that, but I don't read or hear the

 1    particular concern that you're now presenting to the Court.

 2         *THE DEFENDANT:*  Okay.  I see.  I guess I didn't word

 3    this correctly.  I'm assuming that means I need to file another

 4    motion for the treatment program; is that correct?

 5         *THE COURT:*  Well, let's not be so quiet or I'll have

 6    to ask you to move to the podium.

 7         *THE DEFENDANT:*  Sorry.  I'm assuming because of the

 8    way I wrote this, that I would have to file a separate motion

 9    for release from the treatment program altogether?

10         *THE COURT:*  That remains to be seen.  In fairness to

11    the Government and the Court, we're going to focus on the

12    concerns that you have expressed directly in your motion.

13         *THE DEFENDANT:*  Okay.  You got it.

14         As I stated in this, the plethysmograph is

15    inappropriate because it was not explained why it was needed.

16    As per previous rulings, First Circuit, ***U.S. v. Media*** --

17         *THE COURT:*  Any Tenth Circuit opinions?

18         *THE DEFENDANT:*  I do not have any, no, sir.  As far as

19    the polygraph goes, I have Exhibit A.  I'd like to refer to

20    Exhibit A, first of all.

21         *THE COURT:*  What is it?

22         *THE DEFENDANT:*  It is some information I gathered from

23    the Internet through my sister.  It's called "Three Fast Facts

24    about Polygraph Accuracy and What are Some Things to Consider

25    about Polygraphs."

1          *THE COURT:*  All right.  Now, tell me if any of that

2     relates to the use of polygraph in a treatment program as

3     opposed to evidence in a court of law.  You're going to tell me

4     that courts routinely refuse to admit the results of polygraph

5     examinations in a court proceeding.  No argument.

6          *THE DEFENDANT:*  It has to do with validity of

7     polygraphs just in general.

8          *THE COURT:*  All right.  I can tell you that the jury

9     is out.  You can find as many studies favoring polygraphs as

10    you can as disfavoring polygraphs.  This is exhibit what?

11         *THE DEFENDANT:*  A.

12         *THE COURT:*  Any objection by the Government?

13         *MS. RIEWERTS:*  Your Honor, the Government doesn't

14    object to this exhibit to the extent it addresses polygraphs as

15    used in criminal trials and proceedings as opposed to sex

16    offender history polygraphs and clinical polygraphs used for

17    purposes of sex offender treatment.

18         *THE COURT:*  I'm going to give you the benefit of the

19    doubt.  I reluctantly overrule that objection and admit

20    Defendant's Exhibit A for identification.

21         *THE DEFENDANT:*  What I wanted to read was --

22         *THE COURT:*  Don't read it.  I can read it.  You're in

23    luck.  Your judge is literate.

24         *THE DEFENDANT:*  That's good.  Thank you, sir.  I will

25    let that be Exhibit A.

1          *THE COURT:*  You're going to have a time during closing

2    argument you may want to read excerpts from the exhibits that

3    have been admitted, but you need not do it during the

4    presentation of the evidence itself.

5          *THE DEFENDANT:*  Now I understand.  Okay.  Then I would

6    also come up with another exhibit here.  I have it here

7    somewhere.

8          Okay.  The next thing I would like to admit is -- make

9    this Exhibit F.  It is page 151 from the Colorado Sex Offender

10   Management Board.

11         *THE COURT:*  Again, what is it?

12         *THE DEFENDANT:*  It's Exhibit F from the Colorado Sex

13   Offender Management Board under Authorization and Release.

14         *THE COURT:*  All right.  You're offering it?

15         *THE DEFENDANT:*  Yes.

16         *THE COURT:*  Any objection by the Government?

17         *MS. RIEWERTS:*  No, Your Honor.  The Government will be

18   admitting it as an exhibit pursuant, of course, to the Court's

19   permission.

20         *THE COURT:*  Defendant's Exhibit F for identification

21   admitted into evidence.

22         *THE DEFENDANT:*  Okay.  Thank you.

23         *THE COURT:*  You're welcome.

24         *THE DEFENDANT:*  Okay.  The next thing would be

25   Exhibit G, which is page 278 from the United States Sentencing

1    Commission report.

2             *THE COURT:*  And you offer it for what purpose?

3             *THE DEFENDANT:*  To show that the Sentencing Commission

4    has stated there's not consensus on the effectiveness of

5    treatment programs.

6             *THE COURT:*  Any objection by the Government?

7             *MS. RIEWERTS:*  No, Your Honor.  I believe the

8    Government was going to address that same issue.

9             *THE COURT:*  Defendant's Exhibit G for identification

10   admitted in evidence.

11            *THE DEFENDANT:*  Now, do I need to put in exhibits

12   based on things I may state in my closing arguments?

13            *THE COURT:*  Well, I'm looking for the evidence that

14   you want to be considered by the Court.

15            *THE DEFENDANT:*  Okay.  Evidence.  Okay.

16            *THE COURT:*  Your closing argument is not necessarily

17   limited to that which is in evidence.

18            *THE DEFENDANT:*  Okay.  I understand.  Okay.

19            *THE COURT:*  Beyond that, I can't give you legal

20   advice.

21            *THE DEFENDANT:*  Okay.  The only other thing that I

22   would -- I'm afraid that's all I've got, sir.

23            *THE COURT:*  All right.  I have some questions.

24   Ms. Riewerts may have some questions because you're testifying

25   and presenting under oath.

1           *THE DEFENDANT:* Yes, sir.

2           *THE COURT:* Have you been requested or required in

3    your term of supervision to submit to a polygraph examination?

4           *THE DEFENDANT:* Not yet.

5           *THE COURT:* A plethysmograph examination?

6           *THE DEFENDANT:* Not yet.

7           *THE COURT:* Have you been denied contact or

8    communication with your minor children, your minor

9    grandchildren, or your putative stepchildren?

10          *THE DEFENDANT:* I am currently through the halfway

11   house, yes.  I am not on probation yet.  I'm still under BOP

12   custody.  That's part of BOP policy.

13          *THE COURT:* All right.  Very well.

14          *THE DEFENDANT:* I would like to add I still maintain

15   50% custody of one of my minor children to this day.  I thought

16   I would throw it in for the record.

17          *THE COURT:* I presume as a result of a decree of

18   marriage?

19          *THE DEFENDANT:* No.  I was never married.  It was the

20   original order.  Her mother has tried several times to take

21   away my rights.  The Jefferson County court has not granted

22   that.

23          *THE COURT:* This is pursuant to an order entered

24   previously by the District Court of Jefferson County, Colorado?

25          *THE DEFENDANT:* Yes, sir.

WALDEN ALLEN SCHMIDT - Cross

1          *THE COURT:*  Got it.

2          Ms. Riewerts, do you have questions on

3   cross-examination for Mr. Schmidt?

4          *MS. RIEWERTS:*  I do, Your Honor.

5          *THE COURT:*  Now, Mr. Schmidt, I'm going to ask you to

6   come forward and be seated in the witness stand.

7          *THE DEFENDANT:*  Yes, sir.

8          *THE COURT:*  Ms. Riewerts, cross-examination for the

9   Government.

10         *MS. RIEWERTS:*  Thank you, Your Honor.

11         *THE COURT:*  You're welcome.

12                        **CROSS-EXAMINATION**

13  *BY MS. RIEWERTS:*

14  *Q*   Mr. Schmidt, are you familiar with the sex offender

15  treatment program that is offered by the Bureau of Prisons?

16  *A*   Yes -- well, I know of it, yes.

17  *Q*   Were you offered the ability to participate in the sex

18  offender treatment program while you were in the Bureau of

19  Prisons?

20  *A*   It was not offered at the facility I was at, and I chose

21  not to transfer to take it.

22  *Q*   So you were offered the opportunity to transfer to another

23  facility to participate in the sex offender management program,

24  correct?

25  *A*   It was available to me, yes.

25

WALDEN ALLEN SCHMIDT - Cross

1   *Q*   And you decided not to participate in that, correct?

2   *A*   That is correct.

3   *Q*   And that is because you didn't think that you needed to

4   participate in that program; is that correct?

5   *A*   That was one of the reasons, yes.

6   *Q*   What were the other reasons other than the transfer to the

7   other facility?

8         *THE COURT:*  Well, that's important.  I apologize for

9   interrupting.  Where were you?

10        *THE DEFENDANT:*  I was in Ft. Worth, Texas, sir, FMC

11  Ft. Worth.

12        *THE COURT:*  You would have been transferred to what

13  official detention facility within the Bureau of Prisons to

14  participate in sex offender treatment?

15        *THE DEFENDANT:*  It could have been one of three

16  different facilities, either Englewood, Seagoville, or one in

17  Ohio.  I can't remember which one it is in Ohio.

18        *THE COURT:*  Were you opposed to the transfer on

19  grounds other than sex offender treatment?

20        *THE DEFENDANT:*  No.  I actually requested twice to be

21  transferred to Englewood and was denied both times.

22        *THE COURT:*  All right.  I'm through.  I'll butt out.

23  Back you to, Ms. Riewerts.

24        *MS. RIEWERTS:*  Thank you, Your Honor.

25  Q  (By Ms. Riewerts)  With regard to your children, I want to

1    understand the different relationships -- sorry.  With regard

2    to the children who you are related to in one way or another, I

3    want to make sure I understand who they are and what their ages

4    are.

5    *A*    Okay.

6    *Q*    With regard to your two minor children, what are the ages

7    and the sexes of your two minor children?

8    *A*    All of my children are female.  Wesley is 8 years old.

9    *Q*    You don't need to put their names on the record.

10            *THE COURT:*  Let's don't use their name.

11            *THE DEFENDANT:*  Okay.  I'm sorry.

12    *A*    I have an 8-year-old daughter and a currently 5, soon to be

13    6-year-old daughter.

14    Q  (By Ms. Riewerts)  The three stepchildren you referred to

15    earlier, are they a sibling, stepsibling to either the 5- or

16    6-year-old or the 8-year-old?

17    *A*    They're all siblings to the 5-year-old.

18    *Q*    What are the ages and the sexes of the three stepchildren?

19    *A*    They're all female.  One is 3 1/2.  One is 1 1/2.  The

20    other is to be born sometime in April or May.  She's not yet

21    born.

22    *Q*    Where do your 5- and 6-year-old daughter and three

23    additional stepchildren live?

24    *A*    Currently, they reside in Dingwall, Scotland.

25    *Q*    Is the 5- to 6-year-old one of the children you have

WALDEN ALLEN SCHMIDT - Cross

1  custody of?

2  A   No.  There's never been a custody order with her between us

3  because we plan on being together.  There was no need for a

4  custody order.

5  Q   Currently the mother of the four children lives in

6  Scotland; is that correct?

7  A   That is correct.

8  Q   So you do not currently -- again, you explained there were

9  conditions at the facility where you're living right now.

10  There are -- you do not have any sort of face-to-face

11  communication with them; is that correct?

12  A   I do not, no.

13  Q   Since the three stepchildren -- I'm sorry -- the two

14  stepchildren were born during the time frame you were

15  incarcerated, you had previously not had an opportunity to

16  build a relationship with them; is that correct?

17  A   Not so much.  Not so much with the 1 1/2-year-old.  With

18  the 3-year-old, I have written her letters, sent cards on her

19  birthday.  The other thing I did while in prison is I wrote

20  journals for all of my children.  They haven't received them

21  yet, but they exist.  They were daily journals, the purpose of

22  which was to let them know that while I was away I thought

23  about them and loved them every single day.

24  Q   So I'm going to move to your two grandchildren.  Are your

25  two grandchildren both children of the daughter who wrote the

WALDEN ALLEN SCHMIDT - Cross

1   letter who was appended to your motion?

2   A   That is correct.

3   Q   What are their ages and sexes?

4   A   They're both males.  The oldest, I believe, will be 3 this

5   summer.  So he's 2 1/2.  My grandson is just over a year old,

6   my second one.

7   Q   At this point in time, again assuming based on the fact

8   you've been incarcerated in this case, you have not had the

9   opportunity to meet them in person; is that correct?

10  A   That is correct.  I have never met them.

11  Q   In terms of your relationship to them, is it fair to say

12  that you don't have any sort of care-giving responsibilities

13  for them?

14  A   I do not.

15  Q   With regard to your stepchildren, do you have any

16  care-giving responsibilities for them?

17  A   Not yet.

18  Q   Did I understand correctly that you are asking for

19  unsupervised access to all of the children that have been

20  discussing here today, your two minor children, your three

21  stepchildren, and your two grandchildren?

22  A   Yes, please.

23          MS. RIEWERTS:  Those are all the questions I have,

24  Your Honor.

25          THE COURT:  Very well.  What would your reaction be,

1    if any, to limiting supervision to the mothers of those

2    children and grandchildren?

3            *THE DEFENDANT:*  That would be fine.  I'm not against

4    that.  I think my point or my concern is that then they have to

5    be approved by somebody else.  It takes the decision-making out

6    of their hands and puts it in somebody else's based on --

7            *THE COURT:*  No.  A condition could be fashioned that

8    would limit your contact absent supervision by the mother of

9    the child or the grandchild.

10           *THE DEFENDANT:*  I don't follow, sir.

11           *THE COURT:*  Well, you're talking about a situation

12   where you would have to go to your probation officer to seek

13   approval.  I'm talking about a condition that said as long as

14   the visitation or parenting time was supervised by the mother

15   of the child involved, that would be sufficient.

16           *THE DEFENDANT:*  Well, I guess my concern with that is

17   that wouldn't allow me to do -- have one-on-one bonding with

18   the children.  That's what I'm looking for, is to have specific

19   one-on-one bonding with the child so they can have their own

20   personal contact with me without having to always be somebody

21   there without having that stigma for them.  I guess that's what

22   I'm looking for, sir.

23           *THE COURT:*  Now, do you have any redirect testimony in

24   response to the questions asked to you either by the Court or

25   Ms. Riewerts for the Government?

1          *THE DEFENDANT:*  Not at this time.  I'd like to reserve

2     the right to come back later if I think of something.  Is that

3     okay?

4          *THE COURT:*  Well, if it qualifies truly as rebuttal.

5          *THE DEFENDANT:*  Okay.  I -- no.  I think the questions

6     were fine.

7          *THE COURT:*  All right.  Thank you.  For now, and once

8     again, you may stand down and return to your seat.

9          *THE DEFENDANT:*  Thank you, Your Honor.

10          *THE COURT:*  You're welcome.

11          Now, Mr. Schmidt, any further evidence or testimony to

12     present?

13          *THE DEFENDANT:*  No, Your Honor.

14          *THE COURT:*  Thank you.

15          We're going to recess for ten minutes in deference to

16     my staff, after which we'll receive the presentation

17     anticipated by the Government.

18          We are in recess for ten minutes.

19        (Recess taken from 2:59 p.m. to 3:18 p.m.)

20          *THE COURT:*  Thank you.  Please be seated.

21          We continue on the record pursuant to Mr. Schmidt's

22     motion to amend conditions of release.

23          The Court has dispensed with opening statements.  The

24     Court has received the evidence to be presented by Mr. Schmidt

25     in his case in chief, and this is the opportunity for the

1    Government to present its evidence.

2            Ms. Riewerts, the Government may proceed.

3            *MS. RIEWERTS:*  Thank you, Your Honor.

4            *THE COURT:*  You're welcome.

5            *MS. RIEWERTS:*  May I address some initial preliminary

6    matters with the Court prior to calling my witness?

7            *THE COURT:*  You may.

8            *MS. RIEWERTS:*  Thank you.

9            The first matter, Your Honor, is after consulting with

10   the probation department, on the last date probation prepared

11   proposed modified conditions for Mr. Schmidt's consideration.

12           So if I recall correctly, Your Honor, I presented Your

13   Honor with a copy of those proposed modified conditions, but I

14   have an additional copy here if I may present them to the

15   courtroom deputy.

16           *THE COURT:*  You may.

17           *MS. RIEWERTS:*  My understanding is Mr. Schmidt has

18   those modified conditions with him in court today.

19           Your Honor, these conditions were modified to be more

20   consistent with the way that current supervised release

21   conditions are written when defendants are sentenced on child

22   exploitation cases.

23           What has occurred between the time Mr. Schmidt was

24   sentenced and current time is that the sex offender treatment

25   and evaluation has, basically, been broken down into three

1    different paragraphs.  That would be paragraphs 1 through 3 of

2    the proposed modified conditions of supervised release.

3         The first condition addresses the sex offense specific

4    evaluation and/or treatment program.  Plethysmograph is no

5    longer included as a treatment condition as a matter of course.

6    Then proposed condition No. 2 is the periodic polygraph

7    testing, which Mr. Schmidt has objected to.  Condition No. 3 is

8    participation in visual response testing as part of the

9    required participation in sex offense specific evaluation

10   and/or treatment.

11        That was referred to as the Abel Examination in the

12   original conditions of supervised release.

13        With regard to that particular condition, I did not

14   see that Mr. Schmidt specifically objected to that particular

15   condition, but I believe he offered some evidence with regard

16   to visual response testing today.

17        With regard to proposed modified supervised release

18   condition 6, that is the condition wherein the defendant must

19   not associate with any child or children under the age of 18

20   with the exception of his own children, except in the presence

21   and supervision of an adult specifically designated in writing

22   by the probation officer.

23        It goes on to describe those conditions -- further

24   describe that particular condition.

25        So with regard to the plethysmograph and with regard

1    to defendant's contact with his own minor children,

2    unsupervised contact with his own minor children, the

3    Government is no longer requesting that the Court impose those

4    as supervised release conditions, but the Government would

5    still ask that the defendant's stepchildren and grandchildren

6    not be included, of course, as his own children and that they

7    only have supervised contact with the defendant.

8         Your Honor, perhaps mistakenly so, but the Government

9    had understood Mr. Schmidt's motion to be an objection to sex

10   offender treatment generally as opposed to the polygraph and

11   the plethysmograph.

12        As I read back through it more carefully, as Your

13   Honor addressed that earlier, I do suppose that I did

14   understand it more broadly than it was originally written.

15        I prepared Probation Officer Vanni to talk more

16   generally about sex offender treatment in general today.  I

17   know you had addressed the potential for the Government not

18   being prepared to address that issue.

19        If Your Honor would like me to address that through

20   testimony today because it seems as though Mr. Schmidt intended

21   to originally object to sex offender treatment -- sex offender

22   evaluation and treatment, I can address it more broadly, or I

23   can focus him on the polygraph specifically with regard to sex

24   offender treatment and evaluation.

25        *THE COURT:*  Well, I'm going to do what I always do.

1 | The issues raised by the motion are the issues to be considered
2 | and resolved by the Court.

3 |          Mr. Schmidt, with the thanks of the Court, has been
4 | very precise in his objections.  He has identified for the
5 | Court, as well he should, special conditions 3 and 6, and then
6 | with respect to each of those special conditions, he has
7 | further focused the Court's attention on his specific
8 | objections.

9 |          *MS. RIEWERTS:*  With regard to the record, Your Honor,
10 | the Government is going to request that the Court take judicial
11 | notice of certain documents in the court file, and those
12 | documents, I believe, were produced for the defendant so that
13 | he could have access to the court file on the last date.

14 |          Those documents, Your Honor, are ECF document No. 1,
15 | which is the Indictment; ECF document No. 40, which is the Plea
16 | Agreement; the final presentence report in this case, which is
17 | ECF document No. 59 and its attachments; the presentence report
18 | addendum, which is ECF document No. 60; the judgment, which is
19 | ECF document No. 66; and the sentencing transcript, which is
20 | ECF document No. 69.

21 |          *THE COURT:*  Any objection, Mr. Schmidt?

22 |          *THE DEFENDANT:*  No, Your Honor.

23 |          *THE COURT:*  The request of the Government requesting
24 | that the Court take judicial notice of specific documents in
25 | CM/ECF is granted.

1          *MS. RIEWERTS:*  And I would just also note for the

2     record that Exhibits 1 through 3 in the Government's exhibit

3     binder were presented to the defendant in court on the last

4     date.

5          As I noted earlier, Government's Exhibits 4 and 5 are

6     portions of a much lengthier document which was sent to

7     Mr. Schmidt in late December and received on December 31.

8          Your Honor, the Government is of the position that the

9     Court could rely on the record as it stands to make its

10    determination with regard to the defendant's motion.  However,

11    the Government, in an abundance of caution, is going to call

12    probation officer Walter Vanni to the stand.

13         *THE COURT:*  Very well.

14         Mr. Vanni, if you would please come forward to be

15    sworn by the Court.  If you'll stand in this open area in front

16    of my bench, please.  If you'll raise your right hand to be

17    sworn, please.

18       (**WALTER VANNI** was sworn.)

19         *THE WITNESS:*  Yes, Your Honor.

20         *THE COURT:*  Thank you.  Please be seated in that

21    witness stand.

22         Ms. Riewerts.

23         *MS. RIEWERTS:*  Thank you.

24         *THE COURT:*  You're welcome.

25                         **DIRECT EXAMINATION**

WALTER VANNI – Direct

1  *BY MS. RIEWERTS:*

2  *Q*   Could you please speak your name for the record.

3  *A*   Walter Vanni, V, as in Victor, A-N-N-I.

4  *Q*   What is your title?

5  *A*   A senior United States probation officer; specifically, I'm

6  the sex offender specialist for the District of Colorado.

7  *Q*   How long have you worked in that position?

8  *A*   How long have I worked for the District of Colorado?

9  *Q*   Yes.

10  *A*   I have been here just under eight years.

11  *Q*   Could you please briefly summarize your responsibilities in

12  your position.

13  *A*   I currently supervise sex offenders within the metro Denver

14  area.  I only supervise offenders that have a treatment

15  condition imposed.  I also assist other officers in the

16  district, whether it's in other satellite offices or within my

17  own office here in Denver in my field areas, in staffing their

18  cases to ensure consistency with the supervision of sex

19  offenders, and I have other obligations as a sex offender

20  specialist, whether it's assisting investigations, presentence

21  reports, and other questions maybe management may have.

22  *Q*   How were you employed prior to becoming a United States

23  probation officer?

24  *A*   I worked for the 17th judicial district in Colorado,

25  which is Adams and Broomfield county.  I was a sex offender

WALTER VANNI – Direct

1   intensive supervision probation officer.

2   *Q*   How long did you work there?

3   *A*   Seven years.

4   *Q*   Could you please briefly summarize your responsibilities in

5   that position?

6   *A*   I supervised sex offenders that were ordered to be on,

7   again, SOIP, which stands for sex offender intensive probation.

8   *Q*   Did you receive your bachelor's degree?

9   *A*   Yes.

10  *Q*   What was your area of study?

11  *A*   Criminal justice and psychology.

12  *Q*   How many years would you estimate you've worked with sex

13  offenders either at the state or federal level?

14  *A*   Combined I would say 11.

15  *Q*   In terms of your caseload of federal supervisees, what

16  percentage are sex offenders?

17  *A*   All of them.

18  *Q*   I am going to ask you to turn to Government Exhibit 1 and

19  Government Exhibit 2 in the binder in front of you.

20  *A*   One more time.  I apologize.

21  *Q*   If you could turn to -- let's start with Government

22  Exhibit 1.

23  *A*   Okay.

24  *Q*   Do you recognize that?

25  *A*   Yes.

WALTER VANNI – Direct

1    *Q*   What is it?

2    *A*   This is an inmate profile from the Bureau of Prisons.

3    *Q*   And is it an inmate profile for Walden Allen Schmidt?

4    *A*   Correct.

5    *Q*   And at this --

6             *MS. RIEWERTS:*  At this point in time, I'm going to

7    move the inmate profile into evidence.

8             *THE COURT:*  Any objection, Mr. Schmidt?

9             *THE DEFENDANT:*  No, Your Honor.

10            *THE COURT:*  Government's Exhibit 1 for identification

11   admitted in evidence.

12   Q  (By Ms. Riewerts)  I'm going to ask you to also look at

13   Government Exhibit 2, Probation Officer Vanni.  What is that?

14   *A*   This is an inmate education data transcript.

15   *Q*   Does that also pertain to Walden Allen Schmidt?

16   *A*   Correct.

17            *MS. RIEWERTS:*  I'm also going to move to admit

18   Government's Exhibit 2 in evidence.

19            *THE COURT:*  Any objection, Mr. Schmidt?

20            *THE DEFENDANT:*  No, Your Honor.

21            *THE COURT:*  Government's Exhibit 2 for identification

22   admitted in evidence.

23   Q  (By Ms. Riewerts)  With regard to Government Exhibit 1,

24   based on your review of this inmate profile, did the defendant

25   complete sex offender treatment while in the Bureau of Prisons?

WALTER VANNI – Direct

1    A    He did not.  He declined it.

2    Q    And is that declamation -- what is the date of the

3    declamation?

4    A    May 16, 2017.

5    Q    With regard to Government Exhibit 2, the inmate education

6    data transcript, do you see any indication that he completed

7    any classes with regard to sex offender treatment?

8    A    I do not.

9    Q    And with regard to sex offender treatment, is it your

10   understanding that if someone -- whether sex offender treatment

11   in the Bureau of Prisons is voluntary or mandatory?

12   A    It is voluntary.

13   Q    And is it your understanding that if somebody wants to

14   participate in a sex offender treatment program voluntarily,

15   that they will be transferred to a facility that offers that

16   program?

17   A    Correct.

18   Q    Is it true that FCI Englewood does offer a nonresidential

19   sex offender treatment program?

20   A    Correct.

21        THE COURT:  It's only relevant if it was offered

22   during some or all of the incarceration of Mr. Schmidt.

23   Q    (By Ms. Riewerts)  With regard to Government Exhibit 1,

24   Probation Officer Vanni, can you tell from this particular

25   document what -- when the defendant began his period of

WALTER VANNI – Direct

1   incarceration?

2   *A*   I clearly don't see when that may be.  Let's see here.

3   May 2013 date may be around the time.  I -- it's not popping

4   off the page right now.

5   *Q*   With regard to the May 31, 2013, date, is that when

6   Mr. Schmidt received his security classification as low?

7   *A*   Which date?  I apologize.

8   *Q*   The May 31, 2013, date.

9   *A*   Yes.

10  *Q*   With regard to the release date of Mr. Schmidt, is his

11  projected release date indicated in the top block of the page

12  as May 5, 2019?

13  *A*   Correct.

14  *Q*   With regard to Mr. Schmidt, I just want -- in terms of

15  transparency with the Court, have you met Mr. Schmidt prior to

16  the last date that this case was in court in December of 2018?

17  *A*   Not prior to that date.  Prior to this hearing.

18  *Q*   So between December of 2018 and this particular hearing,

19  you have had the occasion to meet Mr. Schmidt?

20  *A*   Correct.

21  *Q*   Is he present here in the courtroom?

22  *A*   He is.

23  *Q*   In terms of the basis for meeting with Mr. Schmidt, could

24  you please provide that for the Court?

25  *A*   His case was assigned to me.  Once he releases in May 2019,

WALTER VANNI – Direct

1    I will be supervising his case.  I have an assignment to have a

2    face-to-face contact within 120 days of the release date when

3    they're in the halfway house.  I, at that face-to-face contact,

4    have a conversation with what a potential release looks like

5    with the resident and any employment opportunities he may have.

6          We also review his judgment, and I can answer any

7    questions he has at that time, and then I direct him to contact

8    me if he finds any residence that he would like to release to

9    to have a plan already approved and also to contact me a week

10   prior to his release so we can schedule a first appointment in

11   May.

12   Q   Moving on, based on your review of the record both as

13   having Mr. Schmidt's case been assigned to you and your

14   conversations with probation officer Gary Kruck who prepared

15   the presentence report and filed probation's motion response in

16   this case, is it your understanding that the defendant was

17   convicted of possession of child pornography?

18   A   Correct.

19   Q   I'm going to ask you to turn to Government Exhibit 3.  What

20   is Government Exhibit 3?

21   A   This is the sex offender management standards and

22   guidelines for assessment, evaluation, and treatment in

23   monitoring of adult sex offenders in the State of Colorado.

24   Q   And are the sex offenders who are under your supervision

25   who are treated in the State of Colorado treated consistent

WALTER VANNI - Direct

1   with these standards and guidelines?

2   A   Correct.

3          MS. RIEWERTS:   At this point in time I'm moving to

4   admit Government's Exhibit 3 in evidence.

5          THE COURT:   Any objection, Mr. Schmidt?

6          THE DEFENDANT:   No, Your Honor.

7          THE COURT:   Government's Exhibit 3 for identification

8   admitted in evidence.

9   Q   (By Ms. Riewerts)   Are you familiar with the contents of

10  Colorado Sex Offender Management Board's standards and

11  guidelines for the assessment, evaluation, treatment, and

12  behavioral monitoring of adult sex offenders?

13  A   Yes.

14  Q   Is it fair to say that the standards govern the practice of

15  treatment providers, evaluators, and polygraph examiners

16  approved by the SOMB in the State of Colorado?

17  A   Yes.

18  Q   How long have you been familiar with the standards and

19  guidelines?

20  A   I would say 2006, 2007 at the latest.

21  Q   Is it your understanding that they are largely

22  evidence-based when empirical research is available?

23  A   Yes.

24  Q   Is it your understanding that they represent best practices

25  in evaluating and treating sex offenders as determined by the

WALTER VANNI – Direct

1  Colorado Sex Offender Management Board?

2  A    Yes.

3  Q    For your reference and for the defendant's reference, I'm

4  going to ask you to turn to page 8 of Government Exhibit 3.

5          THE COURT:  That is Exhibit 3, page 8?

6          MS. RIEWERTS:  That is correct, Your Honor, yes.

7          THE COURT:  Thank you.

8          MS. RIEWERTS:  I was going to ask Probation Officer

9  Vanni to read short excerpts of this particular exhibit to make

10  sure that the defendant knew where it was in the exhibit that

11  we were focused, but if I continue to refer to the page of the

12  exhibit, I think we may be able to move along more quickly.

13  Q  (By Ms. Riewerts)  With regard to paragraph 3, is it fair to

14  say that one of the considerations of the standard and

15  guidelines is community safety and the rights and interests of

16  victims and their families?

17  A    Yes.

18  Q    In paragraph 4, it talks about the fact that offenders are

19  capable of change.  Does it also indicate that responsibility

20  for change ultimately rests with the offender?

21  A    Yes.

22  Q    What is the purpose of the sex offense specific evaluation?

23  A    Sex offense specific evaluation is used to determine

24  amenability to treatment.  It also is able to gauge risk of the

25  offender with assessments that are used during presentence

WALTER VANNI – Direct

1    phases.  It is used to assist the judge to fashion appropriate

2    conditions and an appropriate sentence.  It determines whether

3    or not community-based supervision is appropriate when they're

4    in treatment, or if they should be in a secure setting.

5    Q    As part of your responsibilities as a probation officer

6    supervising federal supervisees, are you in consistent contact

7    with professionals who conduct sex offender evaluations and

8    treatments?

9    A    Yes.

10   Q    Have you had numerous discussions with them over the years

11   of your experience working with sex offenders regarding the

12   tools used to conduct sex offense specific evaluations and

13   treatment for individuals you supervise?

14   A    Yes.

15   Q    Who are the contracted federal sex offender treatment

16   providers in Denver?

17   A    RSA, Incorporated, in Lakewood, Colorado, and Teaching

18   Humane Existence in Denver, Colorado.

19   Q    Is Teaching Humane Existence also known as THE?

20   A    Correct.

21   Q    To your knowledge, do they follow Colorado Sex Offender

22   Management Board standards and guidelines for the assessment,

23   evaluation, treatment, and behavioral monitoring with adult sex

24   offenders for federal sex offenders?

25   A    Yes.

1   Q    Do they continue to amend and revise their standards taking

2   federal case law into account?

3   A    Yes.

4   Q    During the sex offender evaluation, is it your

5   understanding that the appropriateness of the defendant's

6   contact with children is evaluated?

7   A    Yes.

8   Q    Is it true that part of the evaluation assesses the

9   offender's sexual history, arousal interest pattern, and risk

10  of reoffense on other categories?

11  A    Yes.

12  Q    Based on your conversations with Probation Officer Kruck

13  and your own conversation with the defendant, to your

14  knowledge, has the defendant undergone a sex offense specific

15  evaluation?

16  A    No.

17  Q    What is the purpose of sex offender treatment?

18  A    Sex offender treatment is, one, again when we're talking

19  about these guiding principles within the standards, that

20  community safety is paramount.  So we're looking at community

21  safety.

22       Treatment specifically for the offender is to

23  challenge and change cognitive distortions, to improve

24  emotional regulation, to assist in providing the offender with

25  coping strategies and skills to use when everyday problems come

1    up; basically, cognitive behavioral therapy, and to also assist

2    the offender in understanding its abuse cycle and assist the

3    offender in gaining tools that he -- treatment tools he can use

4    in the future.  Hopefully, he internalizes to never reoffend

5    again is the hopes of sex offender treatment.

6    Q    What is a CST or community supervision team in the sex

7    offender evaluation context?

8    A    Community supervision team consists of the probation

9    department, the treatment agency, the polygraph.  It can also

10   include other adjunct that are involved in a defendant's case,

11   such as a mental health professional, substance abuse

12   professional, a psychiatrist, nurse practitioner for receiving

13   medication, halfway house staff.

14           We all get together, sit down, and we staff cases

15   together to ensure that we're all on the same page, that the

16   treatment plan that is in place we're adhering to, that we are

17   ensuring community safety in containment of the offender in the

18   community.  That happens on a regular basis face to face at

19   least one time a month but also by phone and e-mail numerous

20   times a month.

21   Q    Based on your treatment experience and your knowledge of

22   these Colorado Sex Offender Management Board standards and

23   guidelines, which are, of course, not binding on the Federal

24   Court, but it buys the practitioners who treat federal sex

25   offenders here in the district of Colorado, is it appropriate

WALTER VANNI – Direct

1   for somebody convicted of possession of child pornography to

2   undergo sex offender treatment?

3   A    Yes.

4   Q    Why is that?

5   A    That is considered a sex offense under the definition, and

6   when looking at the standards of a sex offender, the sexual

7   exploitation of a child falls within that.

8   Q    That is even though there is no indication that an

9   individual has committed a hands-on offense against a minor?

10  A    Correct.

11  Q    I want to talk about polygraph as a sex offender tool.  In

12  Section 6.0 at page 141 of Government's Exhibit 3, does this

13  section of the Colorado Sex Offender Management Board's

14  standard guidelines address post-conviction sex offender

15  polygraph testing?

16  A    Yes.

17  Q    Is it fair to say that polygraph examinations are a tool

18  which can be used in the greater scheme of treatment?

19  A    Yes.

20  Q    Is it fair to say that they can be -- that they are used,

21  combined with several other methods, to monitor the offender's

22  behavior?

23  A    Yes.

24  Q    Does the use of polygraph help to underscore the sex

25  offender management board's expectation for honesty and

WALTER VANNI – Direct

 1  compliance from offenders?

 2  A   Yes.

 3  Q   Is one type of polygraph a sexual history polygraph?

 4  A   Yes.

 5  Q   What is a sexual history polygraph?

 6  A   It's a polygraph that once an offender has progressed to a

 7  certain stage of treatment, has built a rapport with the

 8  therapist and treatment agency and has put together a sex

 9  history disclosure.  At that time a polygraph is used to assist

10  in the assessment of potential risk but also just to gauge what

11  sexual history is in the defendant's past.

12  Q   Are we talking about risk of sexual recidivism?  When you

13  talk about risk, you mentioned risk as one of the things it

14  helps to assess.  Is it helped to address sexual offender

15  recidivism in the context of offender?

16  A   I would use reoffense instead of recidivism, but yes.

17  Q   Does that include -- is it helpful in assessing the unknown

18  or unreported offenses and other sexual compulsivity, sexual

19  preoccupation, or sexual deviancy behaviors?

20  A   Yes.

21  Q   Is one type of polygraph administered consistent with the

22  guidelines called a maintenance or monitoring polygraph?

23  A   Yes.

24  Q   Is the rule of the maintenance polygraph to thoroughly

25  assess either periodically or randomly the sex offender's

WALTER VANNI – Direct

1  compliance with any of the designated terms and conditions of

2  supervised release and treatment rules?

3  A    Yes.

4  Q    Does the Sex Offender Management Board also state that the

5  maintenance polygraph or the monitoring polygraph conducted in

6  the absence of any new allegations or incidents of concern may

7  be an effective deterrent to high risk or noncompliant

8  behavior?

9  A    Yes.

10  Q    I'd also like to talk about the visual response testing

11  that is included as a proposed condition.

12        MS. RIEWERTS:  Your Honor, the defendant doesn't

13  specifically address visual response testing or the Abel

14  Examination in his papers.  I just want to clarify that the

15  Abel Examination that is in the initial proposed modified

16  conditions -- I'm sorry -- the initial conditions of supervised

17  release is the same as -- is generally the same as visual

18  response testing.

19  A    Yes.  It is the opposite of the plethysmograph.

20  Q    (By Ms. Riewerts)  What do you mean when you say it is the

21  opposite of the plethysmograph?

22  A    A plethysmograph is not a visual reaction time-measuring

23  instrument.

24  Q    Is it true that a plethysmograph actually uses a

25  strain-gauge attached to the penis of the male to be able to

WALTER VANNI – Direct

1    measure arousal?

2    A    Yes.  It measures tumescence.

3    Q    In regard to the visual response testing, is it fair to say

4    it's also called an Abel Examination, a viewing time test, and

5    also can be referred to as the affinity or the look test?

6    A    Correct.

7    Q    Is it fair to say that there is no physical intrusion on

8    the offender during the administration of this test?

9    A    Correct.

10   Q    How is the test facilitated?

11   A    It is at a treatment agency in front of a computer.

12   Q    Is it fair to say that the offender is shown

13   nonpornographic pictures ranging from young children to

14   physically mature adults in a controlled setting and viewing

15   time of the pictures is measured respectively?

16   A    Specifically, the Abel has all individuals clothed, and

17   they are black and white images.

18   Q    And with other visual response testing, are they also based

19   on pictures as opposed to -- observing pictures as opposed to a

20   more intrusive manner?

21   A    Correct.

22   Q    Does the BRT aid the tester in determining sexual

23   preferences and paraphilias?

24   A    Yes.

25   Q    Why is identifying paraphilias and sexual interest

WALTER VANNI – Direct

1  important for purposes of sex offender evaluation and

2  treatment?

3  *A*   It is one of the higher risk factors when seeing reoffense

4  or potential hands-on offenses in the future.

5  *Q*   Is it fair to say that polygraphs and visual response tests

6  as used in sex offender evaluation and treatment are methods to

7  be able to gauge the accuracy of the defendant's self-report?

8  *A*   Yes.

9  *Q*   Probation Officer Vanni, are you familiar with the United

10  States Sentencing Commission's Report to Congress: Federal

11  Child Pornography Offenses also referred to as the 2012

12  Sentencing Commission report?

13  *A*   Yes.

14  *Q*   I'm asking you to look at Government Exhibit 4.  Is that an

15  executive summary of the 2012 Sentencing Commission report?

16  *A*   Yes.

17  *Q*   Does this particular report address federal sentencing

18  policy in child pornography cases focused primarily on

19  nonproduction offenses under the guidelines?

20  *A*   Yes.

21       *MS. RIEWERTS:*  I'm going to --

22  Q  (By Ms. Riewerts)  Let's go to Government Exhibit 5.  What

23  is Government Exhibit 5?

24  *A*   Chapter 10 of the same document, post-conviction issues in

25  child pornography cases.

1          *MS. RIEWERTS:*  At this time, I'm moving to admit

2    Government's Exhibit 4 and Government Exhibit 5.

3          *THE COURT:*  Any objection, Mr. Schmidt?

4          *THE DEFENDANT:*  No, Your Honor.

5          *THE COURT:*  Government's Exhibits 4 and 5 for

6    identification admitted in evidence.

7    Q  (By Ms. Riewerts)  I'm going to ask you to turn to the first

8    section.  Unfortunately, I didn't write down the page number.

9    It's Government Exhibit 4.  It's page VI.  So it's VI.  With

10   regard to that section, I'm going to ask you to look at the

11   introduction to section C1.

12         Is it fair to say that the report emphasizes that even

13   simple possession of child pornography offenses are extremely

14   serious because they both result in perpetual harm to victims

15   and validate and normalize the sexual exploitation of children?

16   *A*   Correct.

17   *Q*   With regard to chapter 10 of the 2012 Sentencing Commission

18   report, you mentioned supervised release or post-conviction

19   issues mentioned in chapter 10.  Is supervised release

20   mentioned in that chapter of the report?

21   *A*   Yes.

22   *Q*   I'm going to ask you to turn to page 277 in Government

23   Exhibit 5.  Can you please briefly summarize what the report

24   says about the importance of evaluation and treatment of child

25   pornography offender sexual disorders?

WALTER VANNI - Direct

1    *A*   "Psychosexual treatment is a recommended condition of

2    supervision for all child pornography offenders.  Many

3    offenders" --

4              *THE COURT:*  Please slow down.

5              *THE WITNESS:*  Sorry.

6    *A*   "Psychosexual treatment is a recommended condition of

7    supervision for all child pornography offenders.  Many

8    offenders also receive treatment in federal prison before being

9    released on supervision.  This section first describes a

10   psychological evaluation and treatment of child pornography

11   offenders.  It next specifically addresses the closely related

12   topic of risk assessment of offenders."

13   Q  (By Ms. Riewerts)  When it referred to the -- one second.

14   When it referred to psychosexual treatment being a recommended

15   condition of supervision for all child pornography offenders,

16   is there a footnote that cites to the sentencing guidelines?

17   *A*   Yes.

18   *Q*   Is that the basis for the Sentencing Commission's report

19   assertion in that first sentence?

20   *A*   Yes.

21   *Q*   Is that United States Sentencing Guidelines Section

22   5D1.3(d)(7)(A)?

23   *A*   Yes.

24   *Q*   With regard to page 278 of Government Exhibit 5, is it fair

25   to say that page 278 states that treatment is an essential

1    component of a comprehensive sex offender management system?

2    A    Yes.

3    Q    Is it also fair to say that studies have found, according

4    to this report, that appropriate treatment interventions are

5    associated with lower rates of recidivism?

6    A    Yes.

7    Q    And as Mr. Schmidt pointed out earlier, is it also fair to

8    say that the report represents the experts disagree about how

9    to measure the effectiveness of treatment programs?

10   A    Yes.

11   Q    Let's turn to page 279 of the report.  With regard to sex

12   offender treatment, what are the goals of -- could you please

13   summarize what the report says the goals of treatment are?

14   A    Several goals.  Larger goal is preventing recidivism,

15   including sexual recidivism, the commission of a new sex

16   offense, including a new child pornography offense.  Subsidiary

17   treatment goals include addressing criminogenic --

18              THE COURT:  Again, please slow down, if you would.

19              THE WITNESS:  I apologize, Your Honor.

20   A    Include addressing criminogenic needs, reducing or

21   eliminating distorted beliefs about sexuality, fostering

22   acceptance of responsibility by offenders, and developing

23   empathy for victims.

24   Q  (By Ms. Riewerts)  When we talk about addressing

25   criminogenic needs, what does that mean?

WALTER VANNI - Direct

1  *A*    Looking at the characteristics of an offender and

2  determining what of those characteristics could potentially

3  result in a reoffense or recidivism.  We break those down into

4  static and dynamic risk factors.

5  *Q*    I'm going to ask you to turn to page 282 of this exhibit.

6  At the top of page 282 is polygraph testing of sex offenders

7  addressed?

8  *A*    Yes.

9  *Q*    Is it fair to say that polygraph testing -- it's states

10  that polygraph testing is widely accepted by experts as a

11  critically important corollary to effective treatment?

12  *A*    Correct.

13  *Q*    Is it also described as a tool to gauge a sex offender's

14  progress in compliance with treatment and supervision

15  expectations?

16  *A*    Yes.

17  *Q*    With regard to the defendant's pro se motion to amend the

18  conditions of his supervised release, are you aware that he has

19  self-reported the reasons for his downloading of child

20  pornography?

21  *A*    Yes.

22  *Q*    Are you aware that they include inadvertently downloading

23  the material initially, being under the influence of cocaine,

24  suffering from PTSD based on the death of his infant son, and

25  critical thinking errors?

WALTER VANNI – Direct

1    *A*    Yes.

2    *Q*    Despite the self-reports and the defendant's belief that he

3    doesn't need sex offender treatment, is it still important for

4    the defendant to participate in sex offender treatment,

5    including the polygraph and visual response testing?

6    *A*    Yes.

7    *Q*    Why is that?

8    *A*    I believe from what you just said and also from listening

9    today to what the defendant said that treatment which will

10   assist in approving his emotional regulation and help him to

11   develop appropriate coping strategies and skills for problems

12   that arise would be beneficial for the offender.

13   *Q*    In terms of contact with minors, based on your experience

14   and training, could you briefly summarize the risks associated

15   with a sex offender convicted of a child pornography possession

16   offense having unsupervised contact with minors?  For this

17   particular circumstance, I'm asking you to consider individuals

18   who he does not have a parent-child relationship with.

19   *A*    Could you restate the question, please.

20   *Q*    Based on your experience and training, should someone who

21   is convicted of possession of child pornography and in the

22   process of being released into the community be allowed to have

23   unsupervised contact with minors?

24   *A*    No.

25   *Q*    Why is that?

WALTER VANNI – Direct

1   A   We would need to have additional information in front of us

2   through assessment to make an informed decision of what is the

3   most appropriate contact at that time.

4   Q   And in terms of -- I'm going to ask you to go to Government

5   Exhibit 3 at page 113.

6   A   Okay.

7   Q   Is it fair to say that the Colorado Sex Offender Management

8   Board warns that the offense for which the offender was charged

9   and convicted is not the only indicator of risk to offend

10  against minor children?

11  A   Correct.

12  Q   Does the Sex Offender Management Board also take the

13  position that a growing body of research indicates most sex

14  offenders supervised by the criminal justice system have more

15  extensive sex offending histories including multiple victim and

16  offense types than is generally identified in criminal justice

17  records?

18  A   Yes.

19  Q   Have you also reviewed research by Michael Seto with regard

20  to contact sexual offending by men with online sexual offenses?

21  A   Yes.

22  Q   Is that a meta-analysis of 24 studies of online noncontact

23  sexual offenders?

24  A   Yes.

25  Q   Did that study reflect that if the only indicator one

WALTER VANNI - Direct

1  relied upon was arrests or convictions, the number of these men

2  who were involved in contact offenses with children was

3  generally less than 20%?

4  A   Correct.

5  Q   And if polygraph testing or some other means to ensure

6  honest self-reporting was used, is it fair to say that the

7  numbers reflected that approximately 55% of the men whose only

8  charged offense was the receipt and possession of child

9  pornography admitted to contact offenses against children?

10 A   Yes.

11 Q   What is the Colorado Sex Offender Management Board's

12 position regarding unsupervised access to minors prior to

13 receiving sex offender treatment if they had been convicted of

14 a child pornography offense?  Let me give the caveat again

15 we're not talking about someone with whom the offender has a

16 parent-child relationship.

17 A   They should not be allowed unsupervised contact, and

18 contact should be determined by the community supervision team

19 depending on many things that are presented during the

20 evaluation and during the onset of treatment and additional

21 assessments that are used during the onset of treatment.

22 Q   During the course of treatment, is it possible that

23 unsupervised access to children will become appropriate?

24 A   Yes.

25          MS. RIEWERTS:  I have no further questions for

WALTER VANNI – Direct

1   Probation Officer Vanni.

2           THE COURT:  Thank you.

3           Mr. Schmidt, do you have questions for Mr. Vanni?

4           THE DEFENDANT:  I do, Your Honor.

5           THE COURT:  Very well.

6           THE DEFENDANT:  Before I begin my questions, I would

7   like it to alert the Court that I'm expected to return to my

8   halfway house at 4:30 and will need to contact them prior to

9   that time if this proceeding goes longer.  Is that acceptable?

10          THE COURT:  Very well.  Please continue to remind the

11  Court if, for some reason, I forget.  That's an important duty,

12  and I understand that.

13          THE DEFENDANT:  I appreciate that very much so, sir.

14                        **CROSS-EXAMINATION**

15  BY THE DEFENDANT:

16  Q   First question I would ask, Officer Vanni, is the

17  completion of the Federal Bureau of Prisons sex offender

18  treatment -- does that fulfill the treatment in its entirety if

19  I had taken it or the defendant had taken it?  Would that

20  fulfill the requirements of sex offender treatment?

21  A   Fulfill the condition ordered for supervised release?

22  Q   Correct.

23  A   No.

24  Q   The other day when we spoke, we discussed the length of the

25  treatment.  Do you remember that discussion?

WALTER VANNI – Cross

1   A   Correct.

2   Q   What did you say the average length of treatment was for a

3   person in this treatment program?

4   A   Depends on how much energy and buy-in the person has.  It

5   could be completed as far as the nuts and bolts of treatment

6   within three years with after-care maintenance to follow.

7   Q   How long would the average after-care maintenance require?

8   A   Depends on the individual.

9   Q   What's the current average of the defendant or offenders

10  that you work with?

11  A   I do not know the average.

12  Q   When we spoke, you said five to seven years.  Do you

13  remember that?

14  A   I do not recall.

15  Q   To the best of your knowledge, are federal offenders

16  required by law to meet the Colorado standard requirements?

17  A   Could you repeat the question, please.

18  Q   To the best of your knowledge, are federal offenders

19  required to meet all the conditions of the Colorado standard

20  management board requirements?

21  A   No.

22  Q   Of all the clients you've worked with, has any assessment

23  ever found that a person doesn't need treatment?

24  A   Depending on the circumstances, yes.

25  Q   So there have actually been offenders that they've said

WALTER VANNI - Cross

1    they don't need treatment at all?

2    A    Depending on the circumstances.

3    Q    Okay.  Thank you.  Are you familiar with the RDAP treatment

4    program?

5    A    Yes.

6    Q    Does it deal with issues of cognitive behavior, to the best

7    of your knowledge?

8    A    To the best of my knowledge, I would -- yes.

9    Q    So there's some crossover between the two programs that are

10    very similar?

11    A    No.

12    Q    As far as cognitive behavior goes?

13    A    I would not say it's very similar.

14    Q    So it's different -- there's two different kinds of

15    cognitive behavior.  Is that what you're saying?

16    A    I'm saying as far as challenging and changing cognitive

17    distortions and behavior, yes.

18    Q    How is it different in your eyes?

19    A    We're talking offense specific treatment compared to drug

20    abuse treatment.

21    Q    Right.  Cognitive behavior in RDAP doesn't necessarily talk

22    about drug behavior.  It talks about behavior in general,

23    correct?

24    A    Again, I haven't taken the program so I could not speak to

25    that specifics of the program.

1   *Q*   Fair enough.  To the best of your knowledge, do you have

2   any known evidence of any other dangerous behaviors on the part

3   of the defendant other than the offense for which he was --

4   pled guilty to?

5   *A*   Could you repeat the question, please.

6   *Q*   Do you have any knowledge of any other offenses that the

7   defendant has engaged in other than the offense that he was

8   convicted of?

9   *A*   I do not have any other knowledge, no.

10  *Q*   Are you aware of the recidivism rate for nonproduction --

11  sexual recidivism rate for nonproduction child pornography

12  offenders?

13          *MS. RIEWERTS:*  I'm going to interject quickly and ask

14  Mr. Schmidt identify what he means by "sexual recidivism rate."

15  If it is hands-on offenses or Internet offenses or all

16  offenses.

17          *THE COURT:*  Well, Mr. Vanni, do you understand

18  Mr. Schmidt's question?

19          *THE WITNESS:*  I would need more --

20          *THE COURT:*  The answer is no, apparently.

21          *THE WITNESS:*  Yes.  I would need additional

22  information as far as what he's defining as recidivism.  Is it

23  conviction?  Is it reoffense?  Is it charges brought up?  I

24  also need to know as far as what potential study he may be

25  talking about.

WALTER VANNI - Cross

1          THE COURT:  The objection is sustained.

2    Q  (By The Defendant)  I was referring to the Commission's

3    report of official recidivism rate, general recidivism rate for

4    sexual offenses.

5    A    I do not know that off the top of my head, no.

6    Q    Would it surprise you to know it was 7.4%?

7    A    Would it surprise me?

8    Q    Yes.

9    A    I don't know how to answer that question, I guess.

10   Q    Okay.  How does that -- when I express that number, how

11   does that compare to recidivism rates for other offenders?

12          MS. RIEWERTS:  Your Honor, I'm going to object again

13   in terms of the specific -- when we're talking about -- I

14   believe defendant used the phrase general sex offenses.  I'm

15   not sure what sort of offenses we're talking about.  I think

16   there are lots of studies that distinguish between hands-on sex

17   offenders versus Internet offenders, a compilation of the two,

18   et cetera.

19          THE COURT:  Well, for now, the only question is, how

20   does that, the percentage cited by Mr. Schmidt, compare to

21   recidivism rates for other offenders?

22          Are you able to answer that question?

23          THE WITNESS:  I am not.

24          THE COURT:  The objection is sustained.

25   Q  (By The Defendant)  The prosecutor brought up the Abel

WALTER VANNI – Cross

1    Examination earlier.  My question for you is, is the Abel

2    Examination able to determine specifically what thoughts are

3    going through the person's head when they're looking at the

4    pictures?

5    *A*    Can it read a person's mind, is what you're asking?

6    *Q*    Yes, sir.

7    *A*    No, it cannot.

8    *Q*    So is it possible the offender could look at an image for a

9    reason other than sexual thoughts?

10   *A*    I do not know.

11   *Q*    I'm asking you if you think it's possible.

12   *A*    I do not know.

13   *Q*    You don't have an opinion on the matter then?

14   *A*    I do not.

15   *Q*    Okay.  Are you familiar -- what did you say your degree was

16   in?

17   *A*    Criminal justice and psychology.

18   *Q*    Criminal justice and psychology.  Is it fair to say that

19   most psychologists deal with issues of coping and emotional

20   issues for their clients?

21   *A*    Depends on the circumstances of the case.

22   *Q*    I'm talking general, therapists in general.  Are they

23   trained in such a way that they deal with people's coping

24   skills and their emotions?

25   *A*    I can't speak to a broad statement of every person's

WALTER VANNI – Cross

1   training.

2   Q   Okay.  When you studied psychology, was that part of your

3   training?

4   A   Was what part of the training?

5   Q   Dealing with coping mechanisms and emotional issues.

6   A   I don't recall specifically.  We're talking about many

7   years ago.

8   Q   Okay.  Well, you stated earlier that the sex offender

9   treatment program was designed to help the person deal with

10  coping issues and coping mechanisms and emotional issues.  My

11  point is, isn't it possible that any therapist could be

12  qualified through their education and degree to handle that

13  same issue?

14  A   Not offense specific.

15  Q   Can you explain the difference?

16  A   One has to do with a sex offense and one does not.

17  Q   But are emotional issues that different when it comes to

18  sex offenses versus any other type of offense?

19  A   I do not know how to answer your question.

20  Q   Well, I'm saying an emotional issue is an emotional issue

21  regardless of the offense.  Isn't it possible that a

22  therapist -- I mean, the emotional issue may or may not have

23  motivated the offense.  So my point I guess that I'm trying to

24  ask you is, isn't it possible that a general therapist could

25  deal with general emotional issues and coping mechanisms

1    regardless of what the offense is that the person was involved

2    in?

3    A    General, yes.  If we're targeting offense specific sex

4    offense, no.

5    Q    Okay.  Do you have any evidence that the defendant poses

6    any danger to children?

7    A    I don't have the appropriate information in front of me to

8    make an informed decision to answer that question.

9    Q    But do you have any evidence at this time?

10   A    At this time, I have no evidence in front of me other than

11   what the Court has presented.

12           THE DEFENDANT:  Okay.  I have no other questions.

13   Thank you.

14           THE COURT:  You're welcome.  Redirect examination of

15   Mr. Vanni for the Government, Ms. Riewerts?

16           MS. RIEWERTS:  No.  Thank you, Your Honor.

17           THE COURT:  May Mr. Vanni be excused and released from

18   subpoena, if any?  Any objection by the Government?

19           MS. RIEWERTS:  No, Your Honor.  Thank you.

20           THE COURT:  Any objection, Mr. Schmidt?

21           THE DEFENDANT:  No, Your Honor.

22           THE COURT:  Mr. Vanni, you are excused with the thanks

23   of the Court.

24           THE WITNESS:  Thank you, Your Honor.

25           THE COURT:  You're welcome.

1          Very well.  The Government may proceed.

2          *MS. RIEWERTS:*  Your Honor, the Government has no more

3   witnesses to call or no more evidence to submit.

4          *THE COURT:*  Very well.  Do you request permission to

5   present rebuttal evidence, Mr. Schmidt?

6          *THE DEFENDANT:*  Is that separate from the closing

7   argument?

8          *THE COURT:*  Yes.  Any additional evidence, including

9   testimony, to present?

10          *THE DEFENDANT:*  No, Your Honor.

11          *THE COURT:*  Very well.  Then we're going to be in

12   recess until roughly 4:30 p.m., after which we shall receive

13   the anticipated closing arguments, commencing with Mr. Schmidt,

14   followed by the Government, and concluding with Mr. Schmidt by

15   way of rebuttal if he requests rebuttal.  We are in recess

16   until 4:30 p.m.

17      (Recess taken from 4:14 p.m. to 4:29 p.m.)

18          *THE COURT:*  Thank you.  Again, please be seated.

19          Very well.  Once again, we resume on the record in

20   open court continuing and concluding hearing of Mr. Schmidt's

21   pro se motion to amend conditions of release.

22          The Court will now receive and entertain the

23   anticipated closing arguments of the parties, commencing with

24   Mr. Schmidt, whose motion this is.

25          Mr. Schmidt.

1          *THE DEFENDANT:*  Thank you, Your Honor.  Did you want

2     me to step to the podium?

3          *THE COURT:*  From the podium, please.  Thank you.

4                              **CLOSING ARGUMENT**

5          *THE DEFENDANT:*  In closing, I recognize that

6     throughout my life I've had many thinking errors, critical

7     thinking errors, some of which resulted in my incarceration.

8          Through the RDAP program, which I'm very thankful that

9     I took and you recommended that I take, I worked through many

10    cognitive distortions, thinking errors, and it wasn't -- the

11    program isn't designed just about drugs.  It's designed about

12    life, life choices, and the decisions we make, and I often

13    reflected on the decision I made which landed me in prison.

14         Most of all, how it impacted my family, especially my

15    children.  I carry a tremendous amount of guilt for those

16    impacts I've had on their lives, and I've taken many steps to

17    rectify them in any way I can, such as writing journals for

18    each of my daughters, daily journals, so that they know none of

19    this was their fault.  It was my doing and that, no matter

20    what, I thought about them and I loved them everyday I was

21    gone.

22         In regards to chances of my recidivism, I discontinued

23    the behavior before the FBI came to my house, several months

24    before the FBI came to my house, and I did it because I

25    realized that this wasn't who I was.  This wasn't something I

1    wanted to be involved in.  There was no other factor that led

2    to that decision.  The FBI raid only reenhanced that decision

3    as being the right decision to do.

4         For two and a half years after the FBI came to my

5    house, I never reengaged in that behavior without any

6    treatment, without any therapy of any kind.  It was because I

7    chose not to reengage in the behavior because it wasn't

8    something I wanted to do, something I wanted to be a part of.

9         That was reenhanced at the birth of my daughter a year

10   after the FBI came to my house.  I remember that day in the

11   hospital looking into her eyes and making the connection.  That

12   changed a lot for my life.  It relieved a lot of my grief over

13   the death of my son.

14        I felt at that moment that I had a second chance at

15   life, I had another chance to be a father.  I failed as a

16   father to my first daughter by not being in her life nearly

17   enough.  I failed my son by not keeping him alive.  That's how

18   I thought.  It may not have been the correct thing, but that's

19   how I felt and how I thought.

20        Seeing her at that moment was amazing to me, and it

21   was beautiful, and I knew at that moment that all I cared about

22   was being a good dad to her and being a better person in

23   society.

24        I made decisions that were going to leave me out of

25   the industry I was in.  I was fixing my teeth to prepare to

1    move into another industry.  I quit using cocaine before the

2    FBI came to my house.  All of those decisions I made of my own

3    decision making because deep inside I knew that wasn't who I

4    wanted to be.  I've never gone back.  I've never looked back.

5    I've never desired to go back.

6          I want to very much continue in my rehabilitation.  I

7    do not want to shy away from it at all, but I want to do it in

8    an environment that I believe in, that I can sink my teeth in

9    that I believe would garner more success.

10         The sex offender treatment program relies on

11   assessments that aren't widely accepted by all the critics that

12   are out there.  They're subjective and not been studied nearly

13   enough to know they're going to be truly effective.

14         I don't feel that I have sexual deviancy issues and,

15   thus, for the length of the treatment, the impact it has on my

16   family, and the use of unvalidated and invasive assessments

17   could be seen as punitive.

18         At least I see it as punitive because it puts the

19   power of my life in somebody else's hands and is based on

20   somebody else's opinions and their thoughts which feels to me

21   that it's a violation of my due process rights.

22         I have absolutely no sexual interest in any child,

23   especially my own.  I find the idea horrific and rotten.  I

24   have many healthy fantasies for my children, things like

25   reading bedtime stories.  I came up with an idea in prison

1   called dancing with daddy to dance with my kids and have fun.

2   My goal is to see them laugh and enjoy life and raise them to

3   be wonderful citizens in this country, not to harm them in any

4   way.

5          My biggest concern with the differentiation between my

6   children, my biological children and stepchildren, is that they

7   will be singled out as having different rules than my

8   biological children, and that concerns me because I don't want

9   to push that stigma that they're not the same.

10          I grew up in a split household with stepbrothers and

11   stepsisters.  The best thing my parents did was treated us as

12   equals.  It didn't matter who was whose son or who was whose

13   daughter.  We were all equal in the family.  We are still to

14   this day.  It is important to me to establish that same level

15   of love and unconditional love both towards my biological

16   children and stepchildren so they don't feel any different.

17          My stepchildren have fathers who aren't going to be in

18   their lives or don't want anything to do with them.  I want

19   everything to do with them from a healthy fatherly perspective,

20   and I want to give them the same life I do my own biological

21   children.  To differentiate between them I fear could cause

22   them unnecessary harm.

23          Also, the treatment program puts the power of my

24   decision to who I marry into somebody else's hands because she

25   has children.  That's a fear I have.  It may be an unrealistic

1    fear.  I do not know because I haven't entered this treatment

2    program yet.  That's one of the reasons why I want to avoid it.

3            In closing arguments, I hope the Court will consider

4    my honest and sincere and humble request for these motions

5    today.  Thank you.

6            *THE COURT:*  You're welcome.

7            Response by the Government, Ms. Riewerts.

8            *MS. RIEWERTS:*  Thank you, Your Honor.  Yes.

9            *THE COURT:*  You're welcome.

10                          **CLOSING ARGUMENT**

11           *MS. RIEWERTS:*  Your Honor, the defendant is adamant

12   that he does not suffer from any sexual deviant mental health

13   issues, and, therefore, does not need sex offender treatment.

14   The defendant is not in the position to make that call.  He's

15   not a trained professional.

16           There is a reason that the defendant chose to collect

17   child pornography.  The reason for it has been self-reported by

18   the defendant in his briefing as inadvertently downloading the

19   material initially, being under the influence of cocaine,

20   suffering from PTSD based on the death of his infant son, and

21   critical thinking errors.

22           There's, of course, no question the death of an infant

23   son is tragic, a very, very tragic occurrence, but there are no

24   evaluations or any other evidence that corroborate that

25   self-reporting by the defendant.

1    This Court has already concluded that there is no

2  causal connection between the unresolved grief and the death of

3  the defendant's child and the selfish lust for the sexual

4  perversion and misuse of children.  That's from the sentencing

5  transcript.

6    In terms of the evidence that we have in the record,

7  the presentence report in paragraph 72 states that the

8  defendant had weekly sex offender treatment in Aurora from

9  August 2012 until the time the report was written in

10  April 2013, but no records or progress reports were received by

11  the probation office.  Entering treatment was a condition of

12  bond in this case.

13    In the defendant's motion for variance, which is ECF

14  document No. 47, it was represented that a doctor may -- would

15  be available to testify at the sentencing that the defendant is

16  not likely to reoffend, is treatable in the community, and but

17  for the sentencing guidelines would likely be a good candidate

18  for probation.

19    As per the sentencing transcript, the defendant's

20  personal therapist, Ms. McMann was at the sentencing and could

21  say he attended 26 different therapy sessions.  There are no

22  materials before the Court that a sex offense specific

23  evaluation has been conducted or what risk the defendant

24  presents to the community with the exception that his counselor

25  recommended that he was treatable in the community.

74

1        Additionally, paragraph 71 of the PSR stated that he

2   had grief counseling.  The Bureau of Prisons records reflect

3   that the defendant declined to participate in sex offender

4   treatment program.  Here today the defendant stated that he was

5   offered the opportunity to participate in the sex offender

6   treatment program and the fact that he didn't need sex offender

7   treatment was one of the reasons that he chose not to

8   participate in that program.

9        In fact, based on his testimony today, it appears that

10   he would have been able potentially to be transferred to the

11   Englewood facility which he requested to do previously if he

12   would participate in the sex offender treatment program, and he

13   declined to do so regardless.

14        Again, I'm not saying he would have been sent to

15   Englewood for his treatment, but, at the same point in time, it

16   sounds as though he very much wanted to go to Englewood and

17   even though potentially the sex offender treatment program

18   would have been a mechanism to get him there and he declined

19   it.

20        The defendant, based on his motion and his declamation

21   of sex offender treatment, clearly does not believe that he

22   needs sex offender treatment, but it is readily apparent based

23   on the record that we need and the defendant needs to

24   understand what led the defendant to collect child pornography

25   as opposed to objects like hats, jerseys, baseball cards, and

75

1    record albums the defendant lists in his motion.

2        The defendant chose to possess images depicting the

3    sexual abuse and torture of children for a reason, and he says

4    that the reason he -- I'm so sorry.  I'm going to start over.

5        He says the reason he did it is because of the grief

6    related to the death of his child and the cocaine and initially

7    having discovered the material inadvertently, but there are a

8    lot of types of material online.  He was drawn to this

9    material, including the sadistic and masochistic portrayal of

10   images of children being sexually abused.

11       The defendant possessed more than 13,000 images of

12   child pornography.  This was not curiosity limited to a small

13   collection.  Many of the images of the children were under the

14   age of 12, some 10 and younger.  I'm basing those on the facts

15   of the Plea Agreement and sentencing transcript.  The images

16   depicted masochism, sadism, bondage, torture, and sodomy.

17       The Court has already addressed the egregiousness of

18   this crime during the defendant's sentencing, and the

19   Government's position is that with regard to the sex offender

20   treatment and evaluation, there's no question as to whether it

21   is reasonably related to the nature and circumstances of this

22   offense of conviction and the history and characteristics of

23   the defendant along with protection of the community.

24       The Government requests that polygraph be allowed to

25   be used by the sex offender evaluation and treatment providers

1   because it is a supervision tool.  The importance of the sex

2   history polygraph and the maintenance polygraphs were described

3   by Probation Officer Vanni.

4         The sex history polygraph is helpful in assessing the

5   sex offender's history of involvement in unknown or -- I'm

6   sorry -- unreported offenses and other sexual compulsivity,

7   sexual preoccupation, or sexual deviancy behaviors.

8         In terms of maintenance polygraphs, the maintenance

9   polygraphs are conducted -- they can be helpful in terms of

10  providing an effective deterrent to high risk or noncompliant

11  behavior, and they can also assess the sex offender's

12  compliance with any of the designated terms and conditions of

13  probation, parole, and treatment paroles.

14        As Your Honor well knows, the defendant I believe

15  mentions *Von Behren* in his briefing.  *Von Behren* does not stand

16  for the proposition that polygraphs may not be included as a

17  condition of supervised release.  Instead, it holds that the

18  defendant may assert his Fifth Amendment right if the answer

19  would incriminate him and he would face a substantial penalty.

20  A substantial penalty would be imposed if he did invoke his

21  Fifth Amendment right.  This in no way precludes polygraphs

22  from being a part of sex offender treatment.

23        In terms of the defendant's repeated denial of his

24  need to participate in continued sex offender evaluation and

25  treatment and the fact that he did not avail himself of the

1   opportunity to participate in sex offender treatment in the

2   Bureau of Prisons, those two things, they only bolster the need

3   for this particular defendant to complete offense specific

4   treatment and related conditions.

5          The recommended conditions are correcting and

6   controlling measures that not only address any issues an

7   evaluation may bring to light, but also protect the community

8   from the future crimes of the defendant by addressing issues

9   known and unknown to the parties in this case.

10         Lastly, the conditions related to sex offender

11  treatment and evaluation do not involve a greater deprivation

12  of liberty than necessary.

13         In terms of the polygraph and the visual -- I'm

14  sorry -- the polygraph testing, the Government with regard to

15  the modified proposed conditions of supervised release, the

16  plethysmograph is not included in those particular conditions.

17         If the Government -- it is the Government's position

18  there is ample evidence in the record to support the polygraph

19  testing as part of the sex offender evaluation, and to the

20  extent it is determined that the record at present is not

21  sufficient to support polygraph testing, the Government

22  respectfully requests the defendant be referred to probation's

23  treatment provider for a sex offense specific evaluation, and

24  that the evaluator advise this Court about what testing is

25  recommended during that defendant -- during the defendant's

1    treatment.

2            Once that is done -- again, this is only if the Court

3    finds there's not enough information in the record to support

4    polygraph testing -- the provider -- and the provider after

5    doing the evaluation determines that certain testing is

6    advisable, the Government then respectfully requests an

7    additional evidentiary hearing to present evidence to support

8    that the polygraph -- as the Government has made clear, the

9    Government takes the position there is ample evidence in the

10   record both based on the offense of conviction and the lack of

11   testing and the need for the very careful studies and treatment

12   programs that information has been presented about to this

13   Court.

14           In terms of contact with minors, the Government

15   presented to the Court -- it wasn't included in the

16   Government's initial briefing.  The Government presented to the

17   Court on the last hearing date three cases and had provided

18   copies of those cases to the defendant.  That was *United States*

19   *v. White*, 782 F.3d 1118, which is a Tenth Circuit case

20   published in 2015; *United States v. Jenks*, J-E-N-K-S, 714

21   Fed.Appx 894, Tenth Circuit 2017.  That's an unpublished case;

22   and *United States v. Pacheco-Donelson*, P-A-C-H-E-C-O,

23   D-O-N-E-L-S-O-N, 893 F.3d 757, and that is a Tenth Circuit case

24   from 2018.

25           With regard to minors, in *United States v. White*,

1    citing *United States v. Smith*, the Tenth Circuit wrote,

2    "General restrictions on contact with children do not involve a

3    greater deprivation of liberty than reasonably necessary in an

4    ordinary case where a defendant has committed a sex offense

5    against children or other vulnerable victims.  This record

6    provides ample evidence that unsupervised contact with minors

7    is reasonably related to the nature and circumstance of the

8    offense of conviction and the history and characteristics of

9    this defendant and is necessary to protect the community in the

10   case where the defendant has been convicted of possession of

11   child pornography."

12           The Government's position is that the defendant hasn't

13   produced any evidence that he has a significant liberty

14   interest and familial association with his grandchildren or

15   with his stepchildren.

16           The Government at this point is not asking for

17   supervised contact with the defendant's own minor children

18   which are the two females who Mr. Schmidt mentioned during his

19   hearing.

20           In terms of *United States v. White*, it references

21   cases which examine the constitutional right of familial

22   association in situations where the defendant is not the

23   custodial parent.  That applies both to the three stepchildren

24   that were mentioned and the two grandchildren that were

25   mentioned.  Quote, "When extending the right of familial

1    association to grandparents, however, courts often consider

2    whether the grandparents are custodial figures or acting in

3    loco parentis."  Therefore, *white* concludes that, quote, "A

4    noncustodial grandparent's right to familial association is

5    entitled to less constitutional protection."  *white* argued that

6    his substantive due process right of familiar association was

7    denied him since he was not allowed unfettered contact with his

8    grandchildren and nieces.

9         The defendant should not have unfettered contact with

10   his grandchildren and stepchildren because of the fact we do

11   not have any sense at the current point in time what risk he

12   presents to those minors.  That will not be known until after

13   the defendant completes a sex offense evaluation and treatment.

14        As Probation Officer Vanni indicated, the defendant,

15   through the process of treatment, may come to a point in time

16   where unsupervised contact with those minors is appropriate,

17   but at the current time that is not the case.

18        *United States v. White* provided guidance to the

19   district court in that case when it remanded the case to the

20   district court for sentencing.  *White* states that, "A

21   noncustodial relative bears the burden to demonstrate that the

22   nature of his familial relationship merits constitutional

23   protection.  There may be a right to familial association

24   between a grandparent and his grandchildren or between a

25   stepparent and his stepchildren," but, quote, "this theory

1   would require proof for the constitutional protection of

2   familial relationships stems from the emotional attachments

3   that derive from the intimacy of daily association."  That's

4   *Pacheco-Donelson* at 760 citing *Smith v. Organization of Foster*

5   *Families for Equality and Reform*, which was a Supreme Court

6   case.

7           This defendant has provided no such proof regarding

8   his grandchildren or his stepchildren.  There is no evidence

9   before the Court that the defendant's relationship with his

10  grandchildren or stepchildren resembles a parental one.

11          He has not met any of these children in person.  While

12  he talks about writing journals for his stepchildren and

13  perhaps also with regard to his grandchildren -- I don't

14  remember his testimony exactly on that point -- but with regard

15  to writing those journals and things along those lines, it may

16  very well down the road be appropriate for him to have contact

17  but as admitted earlier it's currently not.

18          In terms of the record, there's nothing to establish

19  that he has this right to a familial association with these

20  children.  He is not the caregiver for the children.  Two of

21  the children live out of state.  Those are the two

22  grandchildren and also the other three stepchildren currently

23  live out of the country.

24          So on that note with regard to the stepchildren it's

25  also arguable that's a moot point for the current time because

1    the defendant will not be allowed to go to Scotland to visit

2    these children.

3           With regard to the letter that was appended to the

4    defendant's sentencing motion, the defendant's adult daughter

5    trusts him with his grandchildren, but she is, unfortunately --

6    again, this is with no disrespect to her -- she -- as a matter

7    of fact, at the sentencing she talked about in her letter her

8    own lack of contact with her dad and that she doesn't have any

9    experience -- I'm sorry.  It's also true she doesn't have

10   experience in assessing risk for recidivism in sex offense

11   cases and is not in the best position to assure the Court that

12   unsupervised contact around her children is appropriate.

13          Based on the PSR and the daughter's letter, the

14   defendant and his adult daughter have very limited contact and

15   the defendant rarely saw his daughter though they established

16   monthly phone contact when she became an adult.

17          In terms of those relationships, we're not saying he

18   shouldn't have any relationship whatsoever with those children.

19   We're just saying that those contacts should be supervised for

20   the time being.

21          Additionally, with regard to his stepchildren, we

22   don't have any information before the Court what the mother's

23   position or bio father's position is with regard to his access

24   to those children.  If it is determined based on the record at

25   the present time that the defendant does have a parent-like

1    relationship to his grandchildren and/or his stepchildren and

2    the record is not sufficient to determine whether compelling

3    circumstances exist to limit the contact with the defendant's

4    grandchildren or stepchildren, here again the Government

5    respectfully requests that the defendant be referred to

6    probation's treatment provider for a sex offense evaluation,

7    and the evaluator advise this Court about whether unsupervised

8    contact with the defendant's grandchildren and/or stepchildren

9    is advisable.  We would ask for an evidentiary hearing.

10        Again, the Government's position is that the record

11   fully supports sex offender treatment with the polygraph and

12   the visual response testing.  Additionally, supervised contact

13   at this point in time under the conditions in the proposed

14   modified supervised release conditions with all minors,

15   including his grandchildren and his stepchildren, but not to

16   include his biological children.  Thank you, Your Honor.

17        *THE COURT:*  Thank you, Counsel.  Brief rebuttal,

18   Mr. Schmidt.

19        *THE DEFENDANT:*  Yes, Your Honor.  A couple points I

20   would like to address.  One, as far as my daughter is

21   concerned, she knows better than anybody whether I'm a good

22   parent or not, whether I'm safe around my family members.  A

23   subjective assessment can't look at 50 years of my life.  I

24   understand I wasn't around in her life as a child very much,

25   but that wasn't because I didn't want to be.  Circumstances

1    just didn't work out that way.

2          But she knows from her own personal experience that I

3    never presented any sort of risk to her.  I never acted

4    inappropriately to her.  I was a loving, kind, caring father.

5    She's the appropriate person to know whether I would harm any

6    of her children or my other children better than any subjective

7    risk assessment could do.

8          In regards to -- due process says we're innocent until

9    proven guilty.  The prosecution hasn't presented any evidence

10   that I pose any real danger to the community.  I've admitted to

11   my crime.  I've taken responsibility and held myself

12   accountable for my crime.  I've also demonstrated that I've

13   been able to walk away from that choice.

14         When you use a peer-to-peer network, you don't preview

15   what the images are before you download them.  You don't know

16   what they are until you get them.  So to know that I was

17   looking for certain types of images is incorrect.  You get what

18   you get.  You don't know what it is until you get it.

19         She says that -- I know in my statement I said I did

20   it for these reasons.  I wanted to understand the phenomenon.

21   That was my whole purpose of this.  I convinced myself that

22   because I had a degree in social work, because I had done these

23   things, that I suffered from entitlement issues and led myself

24   to believe that I could do this and I wasn't harming anybody.

25   I've admitted I was wrong.  I've realized that just the fact of

1    downloading them adds to their harm.  It adds to the overall

2    community.  For that I was incorrect, but it does not implicate

3    in any way any evidence that I have done this for sexual

4    purposes.  That's all I have to say.  Thank you.

5              *THE COURT:*  Thank you.  Very well.  The issues are

6    joined.  I take the matter under advisement.  You'll have the

7    benefit of the Court's ruling in writing as soon as

8    practicable.

9              Further business now by the Government in this matter?

10              *MS. RIEWERTS:*  No, Your Honor.  Thank you.

11              *THE COURT:*  You're welcome.  Or by you, Mr. Schmidt?

12              *THE DEFENDANT:*  No, Your Honor.  Thank you.

13              *THE COURT:*  You're welcome.  Please close the record

14    in this matter.  The Court is in recess.

15              Madam Clerk.

16              (Court stood in recess at 4:59 p.m.)

17                                    **INDEX**

18    **Item**                                                            **Page**

19    WITNESSES

20       WALDEN ALLEN SCHMIDT

21          Statement by the Defendant                              5

22          Cross-Examination By Ms. Riewerts                      24

23       WALTER VANNI

24          Direct Examination By Ms. Riewerts                     36

25          Cross-Examination By The Defendant                     59

CLOSING ARGUMENTS

    By The Defendant    68

    By Ms. Riewerts    72

PLAINTIFF'S EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---|---|---|---|---|
| 1 | 38 | 38 | | | |
| 2 | 38 | 38 | | | |
| 3 | 42 | 42 | | | |
| 4-5 | 52 | 52 | | | |

DEFENDANT'S EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---|---|---|---|---|
| A | 20 | 20 | | | |
| C | 16 | 17 | | | |
| D | 9 | 10 | | | |
| E | 11 | 11 | | | |
| F | 21 | 21 | | | |
| G | 22 | 22 | | | |

* * * * *

**REPORTER'S CERTIFICATE**

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 17th day of June, 2020.


                    *S/Tracy Weir*
                    Tracy Weir